717 So.2d 488 (1998)
Edward J. ZAKRZEWSKI, II, Appellant,
v.
STATE of Florida, Appellee.
No. 88367.
Supreme Court of Florida.
June 11, 1998.
Rehearing Denied September 9, 1998.
*490 Nancy A. Daniels, Public Defender, and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General, and Mark S. Dunn, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the sentences of the trial court imposing the death penalty upon Edward J. Zakrzewski, II. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. For the reasons expressed below, we affirm the death sentences.
Zakrzewski was charged with the first degree murder of his wife, Sylvia, and his two children, Edward, age seven, and Anna, age five. Zakrzewski pled guilty to all three charges, and the case proceeded to the penalty phase.
The evidence presented during the penalty phase established the following facts. Zakrzewski and his wife had been experiencing marital problems for some time prior to the murders. Zakrzewski twice told a neighbor that he would kill his family rather than let them go through a divorce. On June 9, 1994, the morning of the murders, Edward called Zakrzewski at work and stated that Sylvia wanted a divorce. During his lunch break, Zakrzewski purchased a machete. He returned to work and completed his daily routine. That evening, Zakrzewski arrived home before his wife and children. He hid the machete in the bathroom.
After his family arrived home, Zakrzewski approached Sylvia, who was sitting alone in the living room. He hit her at least twice over the head with a crowbar. The testimony established that Sylvia may have been rendered unconscious as a result of these blows, although not dead. Zakrzewski then dragged Sylvia into the bedroom, where he hit her again and strangled her with rope.
Zakrzewski then called Edward into the bathroom to come brush his teeth. As Edward entered the room, Zakrzewski struck the boy with the machete. Edward realized what his father was doing and tried to block *491 the blow with his arm, causing a wound to his wrist. Further blows caused severe head, neck, and back injuries, and resulted in death.
Zakrzewski then called Anna into the bathroom to brush her teeth. Zakrzewski testified that he hit the girl with the machete as soon as she entered the bathroom. The State's expert testified that the blood spatters from Anna show that the girl was kneeling over the bathtub when she was struck by the machete. Cuts were found on Anna's right hand and elbow, consistent with defensive wounds. The blows from the machete resulted in Anna's death. The evidence was in conflict as to whether Anna was aware of her impending death.
Finally, Zakrzewski dragged his wife from the bedroom to the bathroom. He still was not sure if she was dead, so he hit her with the machete. Sylvia died from blunt force injuries as well as sharp force injuries.
Following the murders, Zakrzewski drove to Orlando and boarded a plane bound for Hawaii. While in Hawaii, Zakrzewski changed his name and lived with a family who ran a religious commune. After he had been there four months, the family happened to watch the television show "Unsolved Mysteries," which aired Zakrzewski's picture. Zakrzewski turned himself in to the local police the next day.
During the penalty phase, the State presented three aggravating factors: (1) the defendant was previously convicted of other capital offenses (the contemporaneous murders), (2) the murders were committed in a cold, calculated, and premeditated manner without pretense of legal or moral justification (CCP), and (3) the murders were committed in an especially heinous, atrocious, or cruel manner (HAC). Zakrzewski presented two statutory mitigators: (1) no significant prior criminal history and (2) the murders were committed while the defendant was under the influence of extreme mental or emotional disturbance. Zakrzewski also presented twenty-four nonstatutory mitigators.[1]
The jury recommended the death penalty for the murders of Sylvia and Edward, both by a vote of seven to five. The jury recommended life imprisonment for the murder of Anna.
As to each of the murders, the trial court found that all three aggravating circumstances were proven beyond a reasonable doubt. The trial court gave significant weight to both of Zakrzewski's statutory mitigators. The trial court also considered and weighed each of Zakrzewski's nonstatutory mitigators.[2] The trial court concluded that the aggravating circumstances outweighed the mitigating circumstances for all three of the murders. The trial court followed the jury's recommendation of death for the murders of Sylvia and Edward. The trial court overrode the jury's recommendation of life for the murder of Anna and imposed death sentences for all three murders.
*492 Zakrzewski raises nine points on appeal. He asserts the following: (1) the trial court erred by finding HAC; (2) the trial court erred by finding CCP; (3) the death sentence is not proportionately warranted in this case; (4) the trial court erred in overriding the jury's recommendation of life for Anna; (5) the trial court allowed prejudicial photographs of the victims to be admitted into evidence; (6) the trial court permitted State's mental health expert to testify about Nietzsche and his views on Christianity; (7) the trial court permitted the State's mental health expert to testify, when the testimony did not rebut the testimony of Zakrzewski's mental health expert; (8) the trial court failed to instruct the jury that Zakrzewski's ability to understand his conduct was substantially impaired; and (9) the trial court failed to instruct the jury on each of Zakrzewski's nonstatutory mitigating factors.[3]
We first address Zakrzewski's claim that CCP is inappropriate in this case. Zakrzewski asserts that because he was under extreme emotional distress at the time of the murders, it was impossible for him to commit the murders in a cold, calculated, and premeditated fashion. Further, Zakrzewski argues that the murders were committed with a pretense of moral justification. We disagree. On the day of the murders, Zakrzewski left work at lunch in order to buy a machete. Zakrzewski proceeded to set up the murder scene before his family arrived home, by placing the machete behind the bathroom door. We find these actions to be both calculated and premeditated. See Rogers v. State, 511 So.2d 526, 533 (Fla. 1987) (stating that "`calculation' consists of a careful plan or prearranged design"); Walls v. State, 641 So.2d 381 (Fla.1994) (holding that CCP requires heightened premeditation, over and above what is required for premeditated first-degree murder, which can be evidenced by a "degree of deliberate ruthlessness"). In addition, Zakrzewski had the entire day for "cool and calm reflection," and the murders were not "prompted by emotional frenzy, panic, or a fit of rage." Jackson v. State, 648 So.2d 85, 89 (Fla.1994). Thus, the murders satisfy the cold element of CCP. See Id. Finally, we do not find that killing one's own family to save them from having to go through a divorce constitutes a pretense of moral or legal justification. See Hill v. State, 688 So.2d 901, 907 (Fla.1996), cert. denied, ___ U.S. ___, 118 S.Ct. 265, 139 L.Ed.2d 191 (1997) (stating that "[n]o one may take the life of another indiscriminately, regardless of what that person may perceive as justification" (quoting Dougan v. State, 595 So.2d 1, 6 (Fla.1992))).
Next, Zakrzewski asserts that HAC is inappropriate in this case as to all of the victims for two reasons. First, Zakrzewski claims that none of the victims had a prolonged awareness of their impending deaths. Second, Zakrzewski points out that it was never his intent to torture the victims.
This Court has stated that in order for HAC to apply, the crime must be both conscienceless or pitiless and unnecessarily torturous to the victim. See Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996); Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992). Clearly, the children's murders comport with this standard. Both Edward and Anna had defensive wounds on their bodies, which shows that both children were aware of their impending deaths. Zakrzewski himself testified that Edward saw his father in the mirror with the machete in his hand. Further, the blood spatter expert testified that the only conclusion that could be drawn from the positioning of Anna's blood in the bathroom was that Anna was forced to kneel over the ledge of the bathtub  in execution-style fashion  before Zakrzewski delivered the deadly blows. Not only was Anna aware of her own impending death, she no doubt could see her brother's already dead body in the bathtub. We cannot speculate as to what Zakrzewski's intentions were when he chose a machete as the means to carry out these murders. However, we are certain that by murdering his children with a machete, Zakrzewski caused his children to suffer an unthinkable horror. Therefore, the trial court did not err in finding HAC as to the children.
As for Sylvia's death, we find that the trial court's finding of HAC was erroneous. *493 The State has the burden of proving beyond a reasonable doubt that an aggravator has been established. See Rhodes v. State, 547 So.2d 1201, 1208 (Fla.1989). Medical testimony was offered during the trial which established that Sylvia may have been rendered unconscious upon receiving the first blow from the crowbar, and as a result, she was unaware of her impending death. We have generally held awareness to be a component of the HAC aggravator. See, e.g., Wyatt v. State, 641 So.2d 1336, 1341 (Fla. 1994) (holding that HAC is repeatedly upheld where the victims are "acutely aware of their impending deaths"); Jones v. State, 569 So.2d 1234, 1238 (Fla.1990) (holding that events occurring after the death of a victim cannot be considered in determining HAC); Jackson v. State, 451 So.2d 458, 463 (Fla. 1984) (holding that circumstances that contribute to a victim's death after the victim becomes unconscious cannot be considered in determining HAC). Based on the medical expert's testimony, we conclude that the State has failed to meet this burden. Therefore, we find that it was error for the trial court to apply the HAC aggravator to Sylvia's murder. Nevertheless, in light of the other two aggravators that apply to Sylvia's murder (CCP and the contemporaneous murders), "[w]e do not believe that the erroneous consideration of the aggravating factor that the murder was especially heinous, atrocious, or cruel prejudicially affected the weighing process." Watts v. State, 593 So.2d 198, 204 (Fla.1992). Therefore, this error was harmless beyond a reasonable doubt. See id.
In his third issue, Zakrzewski claims that the death penalty is disproportionate in this case. Zakrzewski cites to a number of cases to support alleged exceptions to the death penalty for domestic murders and "middle-class" murders.[4] We reject that this case fits into an exception to the death penalty, noting that this Court has never recognized such an exception for either of these types of murders. See Spencer v. State, 691 So.2d 1062, 1065 (Fla.1996), cert. denied, ___ U.S. ___, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997). In Spencer, we stated:
[T]his Court has never approved a "domestic dispute" exception to imposition of the death penalty. See [Santos v. State, 629 So.2d 838 (Fla.1994)] (finding death sentence disproportionate because four mitigating circumstances of extreme emotional disturbance, substantial inability to conform conduct to requirements of law, no prior history of criminal conduct, and abusive childhood outweighed single aggravating circumstance of prior violent felonies based upon crimes that occurred during the murders). In some murders that result from domestic disputes, we have determined that CCP was erroneously found because the heated passions involved were antithetical to "cold" deliberation. Santos v. State, 591 So.2d 160, 162 (Fla.1991); Douglas v. State, 575 So.2d 165, 167 (Fla. 1991). However, we have only reversed the death penalty if the striking of the CCP aggravator results in the death sentence being disproportionate.
Id. Zakrzewski also asserts that the death penalty is unwarranted in domestic killings where the defendant suffered from a damaged brain or an extreme emotional disturbance. Zakrzewski cites to Kampff v. State, 371 So.2d 1007 (Fla.1979), and Klokoc v. State, 589 So.2d 219 (Fla.1991), to support this proposition. Kampff and Klokoc are distinguishable from the present case. In Kampff, we concluded that the State could not sufficiently establish any aggravating factors. In Klokoc, we concluded that the State could only establish one aggravating factor, balanced against numerous mitigating factors. The case of Lemon v. State, 456 So.2d 885 (Fla.1984), is more on point. In Lemon, this Court upheld the death penalty where Lemon was convicted of stabbing a woman *494 with whom he had a relationship. Lemon involved similar circumstances, two aggravating factors  HAC and a prior violent felony conviction  and one mitigating factor  emotional disturbance.
In the instant case, the trial judge found two statutory mitigating factors, as well as a number of nonstatutory mitigating factors. As to the murders of Edward and Anna, the trial judge properly found that three aggravators were established (HAC, CCP, and the contemporaneous murders). The trial judge determined that the mitigating factors did not outweigh the aggravating factors. We find no error in this finding. As to Sylvia's murder, in light of our previous analysis regarding HAC, only two aggravators were properly established (CCP and the contemporaneous murders). Nevertheless, based on the weight of these two aggravators, we do not find that the death sentence is disproportionate for the murder of Sylvia.
Additionally, considering the facts of this case, we find the death penalty to be proportionate to other cases. See, e.g., Henry v. State, 649 So.2d 1366 (Fla.1994) (affirming death penalty where defendant stabbed his wife repeatedly in the throat and kidnapped and stabbed her five-year-old son from a previous marriage); Bruno v. State, 574 So.2d 76 (Fla.1991) (affirming the death penalty where the defendant beat the victim in the head with a crowbar, followed by shooting the victim in the head); Davis v. State, 461 So.2d 67 (Fla.1984) (affirming death penalty where defendant beat a mother over the head with a pistol, tied one child up and shot her twice, and both beat and shot the second child). Accordingly, we find no merit to this issue.
In issue four, Zakrzewski argues that it was improper for the trial court to override the jury's recommendation of life for Anna. We stated in Tedder v. State, 322 So.2d 908, 910 (Fla.1975), that "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." We find that the facts suggesting the sentence of death for all three of these murders are clear and convincing, and as to Anna, even more compelling. We note that the trial judge found the same aggravating and mitigating circumstances applied to the murders of both Edward and Anna. See Garcia v. State, 644 So.2d 59, 64 (Fla.1994). We conclude that "no reasonable person could differ" as to the appropriateness of the death penalty for the murder of Anna. Accordingly, we find that the trial court did not err in overriding the jury's recommendation of life for the murder of Anna.
In his next issue, Zakrzewski asserts that it was improper for the trial court to admit prejudicial photographs of the victims into evidence. We rejected a similar argument in Pope v. State, 679 So.2d 710 (Fla. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 975, 136 L.Ed.2d 858 (1997). In Pope, we stated:
Pope next asserts that the trial court erred by admitting inflammatory photographs of the bloody bathroom where the stabbing occurred, autopsy photographs, and the victim's bloody clothes. We disagree. The test for admissibility of photographic evidence is relevancy rather than necessity. Nixon v. State, 572 So.2d 1336, 1342 (Fla.1990), cert. denied, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991). The photographs of the bathroom and the clothes were relevant to establish the manner in which the murder was committed and to assist the crime scene technician in explaining the condition of the crime scene when the police arrived. The autopsy photographs were relevant to illustrate the medical examiner's testimony and the injuries he noted on Alice. Relevant evidence which is not so shocking as to outweigh its probative value is admissible. Having viewed the photographs, we cannot say the trial court abused her discretion. See Jones v. State, 648 So.2d 669, 679 (Fla. 1994), cert. denied, 515 U.S. 1147, 115 S.Ct. 2588, 132 L.Ed.2d 836 (1995).
Id., 679 So.2d at 713-14. Further, we note that the objection in Pope arose at the trial phase. In the present case, Zakrzewski objected to the photographs being admitted at the penalty phase. Section 921.142(2), Florida Statutes (1995), which describes the procedure for the penalty phase of a capital *495 case, states "[a]ny such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence...." For these reasons, we reject Zakrzewski's argument.
In issues six and seven, Zakrzewski raises points regarding the right of the State to present testimony of its own mental health expert. This Court has recently approved Rule 3.202 of the Florida Rules of Criminal Procedure, which allows the state's expert an opportunity to examine a defendant who intends to offer expert testimony of mental mitigation. Again, the standard for determining whether an expert's testimony is admissible at the penalty phase is whether the testimony has probative value. See § 921.142(2), Fla. Stat. (1995). In the instant case, Zakrzewski offered as statutory mitigation that he was under the influence of extreme emotional disturbance at the time of the murders. Dr. James D. Larson, one of the defense experts, testified that Zakrzewski "decided to end [his family's] misery by taking their lives and carry their pain." In contrast, Dr. Henry McClaren, the State's expert, testified that Zakrzewski murdered his wife in order to end "a very large source of pain for himself." This information was relevant in determining whether or not the mitigator existed and the weight that such mitigation should be afforded. Therefore, we conclude that the trial court did not commit error in allowing Dr. McClaren to testify on this issue.
Zakrzewski also claimed as non statutory mitigation that he had embraced the Christian faith since the offense. Zakrzewski's preoccupation with the German philosopher Friedrich Nietzsche, both before and after the murders, was an issue throughout the trial. In his testimony, Dr. McClaren addressed Zakrzewski's preoccupation with Nietzsche, and Nietzsche's views on Christianity. Defense counsel objected to this line of questioning, stating that Dr. McClaren was not an expert in this area. However, the trial judge permitted Dr. McClaren to testify on the subject after Dr. McClaren stated that he had familiarized himself with Nietzsche's philosophy. The trial judge refused to allow defense counsel to voir dire Dr. McClaren on this issue. Dr. McClaren proceeded to testify that Nietzsche "vigorously attacked Christianity." Zakrzewski claims that it was error both in failing to allow defense counsel to voir dire Dr. McClaren and in permitting Dr. McClaren to answer the question regarding Nietzsche's views on Christianity. We disagree. Zakrzewski's preoccupation with Nietzsche's philosophy was relevant to Dr. McClaren's examination. When asked how he familiarized himself with Nietzsche's philosophy, Dr. McClaren responded by saying that he read information in encyclopedias and various writings of Nietzsche. Thus, the proper predicate was laid. We do not find that the trial court abused its discretion in refusing to allow defense counsel to voir dire Dr. McClaren. Additionally, Zakrzewski was not precluded from cross-examining Dr. McClaren or presenting rebuttal evidence. Therefore, we find no merit to Zakrzewski's claim.
In issue eight, Zakrzewski claims that it was error for the trial court to refuse to instruct the jury that Zakrzewski's ability to understand the criminality of his conduct was substantially impaired. None of the three medical experts offered any testimony to support this instruction. Accordingly, we find that it was not error for the trial court to refuse this instruction.
As his final issue, Zakrzewski claims that it was error for the trial court to refuse to instruct the jury on each of the nonstatutory mitigating factors. We stated in James v. State, 695 So.2d 1229, 1238 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 569, 139 L.Ed.2d 409 (1997), that the trial court is only required to give the "catch-all" instruction on nonstatutory mitigating evidence. Thus, we find that there was no error as to this issue.
Accordingly, we affirm the three death sentences imposed in this case.
It is so ordered.
OVERTON and HARDING, JJ., and GRIMES, Senior Justice, concur.
WELLS, J., concurs in the result.
*496 ANSTEAD, J., concurs in part and dissents in part with an opinion, in which KOGAN, C.J., and SHAW, J., concur.
ANSTEAD, Justice, concurring in part and dissenting in part.
I concur in the majority opinion and in its approval of the imposition of the death penalty for the murder of appellant's child Edward. The majority opinion speaks for itself in its analysis upholding the trial judge's sentence, supported by a jury recommendation and additionally safeguarded by this Court's independent proportionality review. Hence, without dissent, the appellant stands convicted and sentenced to death. However, this bottom-line result should give us substantial reason to pause in disturbing and deviating from our principled and established case law on the issue of a jury override, which I fear the majority, in an emotional reaction to the factual circumstances presented here, has done. The majority has not honored Tedder and our consistent case law in holding that, despite the unusual and unique circumstances involved herein, and the extensive amount of statutory and non statutory mitigation established, no reasonable juror could vote for mercy, as the jury did here, and spare appellant's life for the killing of the child Anna, while voting for death in the killing of Edward.[5]
The mistake of the majority is illustrated by the recent case of Esty v. State, 642 So.2d 1074, 1076 (Fla.1994), where the trial court overrode the jury's life recommendation and found the HAC and CCP aggravators, the statutory mitigator of no significant prior criminal history, and no nonstatutory mitigation. In reversing the improper override, we explained the Tedder standard and its application:
For a trial judge to override a jury recommendation of life, `the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ.' Tedder v. State, 322 So.2d 908, 910 (Fla.1975). An override is improper if there is a reasonable basis in the record to support the jury's recommendation. Ferry v. State, 507 So.2d 1373, 1376 (Fla.1987). The record in this case reveals a number of factors that support the jury's recommendation, including Esty's age of eighteen at the time of the murder, his lack of a criminal history, his potential for rehabilitation, and the possibility that he acted in an emotional rage. Thus, we conclude that jury override was improper because the jurors could have relied on these factors established in the *497 record to recommend a life sentence in this case.

Id., 642 So.2d at 1080 (emphasis supplied). Similarly, in Strausser v. State, 682 So.2d 539, 542 (Fla.1996), we found that the trial court's override failed the Tedder standard because "there was vast mitigation to support the jury's recommendation." Likewise, we have just recently again reaffirmed this enduring standard in reversing the trial court's override of the jury's recommendation of a life sentence in Pomeranz v. State, 703 So.2d 465, 471 (Fla.1997), the latest of a series of recent cases wherein we have consistently reaffirmed Tedder. See Marta-Rodriguez v. State, 699 So.2d 1010, 1012-1013 (Fla.1997); Jenkins v. State, 692 So.2d 893, 895 (Fla.1997); Boyett v. State, 688 So.2d 308, 310 (Fla.1996).
The majority has not considered the facts in a light most favorable to the recommendation of the jury, as we are required to do, or acknowledged the unchallenged reasonable basis in the record supporting the jury's vote as to Anna's death. Further, the majority has ignored not only the evidence and inferences therefrom that would support the jury's recommendation, but has also ignored the fact that even the jury vote recommending death was by a slim seven to five margin, one vote away from a life recommendation for the appellant. Hence, the majority, in direct violation of the law and our decision in Tedder has substituted its subjective analysis of the facts for the views of the sworn and death-qualified jurors, who not only could have had reasonable but differing views as to whether death was appropriate, but did have those views and openly expressed them. The majority has apparently concluded that because its members would not have extended mercy, the views of the twelve citizens sitting on this jury extending mercy will be ignored.
There can be no legitimate dispute that the jury had an abundance of evidence upon which it could have based its life recommendation for Anna's death. Indeed, the extensive mitigation found by the trial court in this case is vastly greater than that found in the cases discussed above and, both in its nature and degree, is unique. Even the trial judge, who obviously disagreed with the jury's recommendation, acknowledged the existence of the unusual extent of the mitigation and found two statutory mitigators, no significant prior criminal history and under the influence of an extreme mental or emotional disturbance, and gave varying degrees of weight to some fourteen (14) nonstatutory mitigators, ranging from substantial to slight weight. On such a record there is simply no way that we can properly conclude that there is no "reasonable basis in the record to support the jury's recommendation."
Moreover, the majority opinion implies that the jury's recommendation of life for Anna's murder was "unreasonable," apparently because it was inconsistent with its recommendation of death for Sylvia's and Edward's murders: "We find that the facts suggesting the sentence of death for all three of these murders are clear and convincing, and as to Anna, even more compelling. We note that the trial judge found the same aggravating and mitigating circumstances applied to the murders of both Edward and Anna." Majority op. at 481.[6] However, beyond *498 the consistency inference, the reference to the "compelling" facts of Anna's murder is perplexing because the majority opinion notes that while "Edward realized what his father was doing," id. at 477, "[t]he evidence was in conflict as to whether Anna was aware of her impending death." Id. Hence, in addition to the unprecedented mitigation presented, the majority has itself identified another substantial basis for the jury's recommendation by pointing out that the jury could have reasonably concluded, because the evidence was in conflict, that Anna was not aware of her impending death. In that event, for example, the jury would also not have found the HAC aggravator for Anna's death since that aggravator requires a finding of consciousness of impending death. So, the majority opinion has demonstrated a number of reasonable bases for the life recommendation.
As we approach the 21st century of our civilization, do we really want to take a law (the trial judge's sentencing discretion) that was intended to act as a rational check on a jury possibly voting for death based upon an emotional appeal, and twist that law so as to use it as a sword for the judiciary to emotionally trump a jury acting with reasoned mercy?
KOGAN, C.J., and SHAW, J., concur.
NOTES
[1] Zakrzewski presented the following nonstatutory mitigating factors: (1) the defendant turned himself in; (2) the defendant pled guilty; (3) the defendant is an exceptionally hard worker; (4) the defendant was on the Dean's List in his third year of college; (5) the defendant served in an exemplary manner in the United States Air Force; (6) the defendant showed severe grief and remorse; (7) the defendant was a loving husband and father until the offense; (8) the defendant was under great stress due to work, college, child care, housework, and lack of sleep; (9) the defendant is a patient and humble man; (10) the defendant was raised without his natural father in his home; (11) the defendant had a lack of prior domestic relationships; (12) the defendant's role in his marriage was passive in a union dominated by his wife; (13) the defendant received little religious upbringing; (14) the defendant has embraced the Christian faith since the offense; (15) the defendant was a hyperactive child and was medicated on ritalin; (16) the defendant has a long term adjustment disorder; (17) the defendant was suffering from a major depressive episode; (18) the defendant has potential for rehabilitation; (19) the defendant exhibited good behavior while hiding for an extended period of time under an assumed name; (20) the defendant was a loving and good son; (21) the defendant is intelligent; (22) the defendant is well thought of by friends, neighbors, and co workers; (23) the defendant was impaired by alcohol at the time of the offense; and (24) the defendant is not a psychopath.
[2] The trial court gave substantial weight to factors 6 and 7; significant weight to factors 3, 4, and 5; little weight to factors 1, 2, 8, 9, 10, 11, 13, and 14; and slight weight to factor 19. The remaining factors were given no weight.
[3] Issues one and two are addressed in reverse order in this opinion.
[4] Zakrzewski states that this Court has consistently refused to affirm death sentences where defendants have killed their wives, girlfriends, and children as a result of intense jealousy or unmanageable anger. To support this, Zakrzewski cites to Douglas v. State, 575 So.2d 165, 167 (Fla.1991), and Farinas v. State, 569 So.2d 425, 431-32 (Fla.1990). Zakrzewski also asserts to the so-called "middle class" murder exception  those murders where the defendant, a respectable citizen, succumbs to the horrible explosion of total criminality that sometimes overcomes fundamentally decent people. Zakrzewski cites to State v. Dixon, 283 So.2d 1 (Fla.1973), to support this argument.
[5] Of course, we have traditionally paid special deference to our own precedent. For example, we long ago wrote, "Respect for the rule of stare decisis impels us to follow the precedents we find to have governed this question for so long. This is especially true where the argument to change is persuasive but not overwhelming." Old Plantation Corp. v. Maule Industries, Inc., 68 So.2d 180, 183 (Fla.1953). A sampling of more recent opinions reveals that current members of this Court have invoked this time-honored maxim of principled judicial decision-making in numerous opinions. For example, Justice Overton has written:

I ... strongly believe that adhering to precedent is an essential part of our judicial system and philosophy of law. The doctrine of precedent is basic to our system of justice. In simple terms, it ensures that similarly situated individuals are treated alike rather than in accordance with the personal view of any particular judge. In other words, precedent requires that, when the facts are the same, the law should be applied the same.
Perez v. State, 620 So.2d 1256, 1259 (Fla.1993) (Overton, J., concurring). Similarly, Justice Harding has consistently written that:
The doctrine of stare decisis provides stability to the law and to the society governed by the law. While no one would advocate blind adherence to prior law, certainly a change from that law should be principled. Where a rule of law has been adopted after reasoned consideration and then strictly followed over the course of years, the rule should not be abandoned without a change in the circumstances that justified its adoption.
Snyder v. Davis, 699 So.2d 999, 1007 (Fla.1997) (Harding, J., dissenting) (quoting State v. Schopp, 653 So.2d 1016, 1023 (Fla.1995) (Harding, J., dissenting)). Finally, in debating the constitutionality of the felony murder aggravator, Justice Wells has recently written that:
If the doctrine of stare decisis has any efficacy under our case law, death penalty jurisprudence cries out for its application. Destabilizing the law in these cases has overwhelming consequences and clearly should not be in respect to law which has been as fundamental as this and which has been previously given repeatedly thoughtful consideration by this Court.
Blanco v. State, 706 So.2d 7, 12 (Fla.1997) (Wells, J., concurring).
[6] While the case cited for this proposition offers an example of a proper override, Garcia v. State, 644 So.2d 59 (Fla.1994), even a cursory examination of the basis for that finding reveals its utter inapplicability to the facts of this case. There, two elderly sisters died after being repeatedly stabbed by the defendant; one of the sisters was also sexually battered by the defendant. Nevertheless, the jury recommended a life sentence for one of the murders, while unanimously recommending death for the murder of the other sister. After finding four aggravators and no mitigators, the trial judge accepted the jury's death recommendation for the murder of one sister. Id. at 61. As noted in this Court's opinion, the trial judge overrode the jury's life recommendation for the other sister and imposed a death sentence "relying on the same four aggravators and absence of mitigators." Id. at 62. This Court affirmed both death sentences on appeal, reasoning that the trial judge did not err in overriding the jury's life recommendation because he found the same aggravators and [absence of] mitigators applicable to the murders of both sisters. Id. at 64.

Clearly, the facts and circumstances in Garcia provide no support for the majority's conclusion in this case. Here, the jury recommendations turned on the slimmest of margins as opposed to the huge variance in Garcia. And, of course, this jury had vast mitigation to base a life recommendation on, while the Garcia jury apparently had none. Indeed, the defendant in Garcia "chose not to present any evidence in the penalty phase and expressly declined to present evidence that his codefendant had received two life sentences for his role in the murders." 644 So.2d at 61. In the final analysis, the majority's tenuous reliance on Garcia simply underscores its abandonment, with no compelling rationale, of our principled and well-reasoned caselaw in Tedder and its progeny.