748 So.2d 237 (1999)
Joshua D. NELSON, Appellant,
v.
STATE of Florida, Appellee.
No. 89,540.
Supreme Court of Florida.
May 27, 1999.
Rehearing Denied September 30, 1999.
*239 James Marion Moorman, Public Defender, and Paul C. Helm, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Candance M. Sabella and Carol M. Dittmar, Assistant Attorneys General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Joshua D. Nelson. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. As explained below, we affirm Nelson's convictions and sentence of death.
The evidence presented at trial established the following facts. Nelson and Keith Brennan wanted to leave the city of Cape Coral. The two devised a plan to murder Tommy Owens and steal his car. Nelson and Brennan knew that Owens kept a baseball bat in his car. On the evening of March 10, 1995, Owens was lured under false pretenses to a remote street. Nelson and Brennan were able to convince Owens to exit his car, whereupon Nelson hit Owens with the bat. After a number of blows, Owens eventually fell to the ground. Nelson and Brennan tied Owens' legs and arms. Owens pleaded for his life, stating that the two could take his car. After a brief discussion, Nelson and Brennan concluded that to avoid being caught, they should kill Owens. Brennan attempted to slice Owens' throat with a box cutter. Owens was not unconscious when the attacks began and he begged Nelson to hit him again with the bat so as to knock him unconscious before the stabbing continued. Nelson did as Owens requested and Brennan continued to attack Owens with the box cutter. Nelson and Brennan also continued to strike Owens a number of times with the bat. The two eventually dragged Owens' body to nearby bushes, where Owens later died.
Nelson and Brennan picked up Tina Porth and Misty Porth and the four left the city in Owens' car. After stopping in Daytona Beach, the four left the state and drove to New Jersey. At different times during the trip, Nelson and Brennan informed Tina and Misty that they had murdered Owens. Both Tina and Misty testified at trial.
Nelson and Brennan were apprehended by law enforcement officers in New Jersey. Nelson gave a video- and audio-taped confession. In the confession, Nelson detailed his account of the murder, both at *240 the crime scene and at the place where the bat was recovered. The video-taped confession was played to the jury. Additionally, an analyst for the Florida Department of Law Enforcement testified that blood stains on Nelson's shoes, the box cutter, and a pair of underwear that the box cutter was wrapped in all matched Owens' DNA.
Nelson was found guilty of first-degree murder and robbery with a deadly weapon. At the penalty phase, the jury recommenced death by a twelve-zero vote. The trial court found three aggravators: (1) the murder was committed in the course of a robbery; (2) the murder was especially heinous, atrocious, or cruel (HAC); and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification (CCP). The trial court also found that one statutory mitigator (age of eighteen at the time of the crime) and fifteen nonstatutory mitigators[1] were established. The statutory mitigator was given great weight. The first nonstatutory mitigator was given substantial weight, and the remaining nonstatutory mitigators were given from moderate to little weight. The trial court concluded that Nelson failed to establish the following statutory mitigators: (1) that he acted under the effect of extreme emotional disturbance, (2) that he was an accomplice with minor participation, (3) that he acted under the domination of another person, and (4) that his capacity to appreciate the criminality of his conduct was impaired. The trial court followed the jury's recommendation and imposed the death penalty for the first-degree murder conviction. The trial court sentenced Nelson to 189 months in prison for the robbery conviction.
Nelson raises seven issues on appeal. He asserts the following: (1) the trial court erred by failing to properly determine the admissibility of testimony by the State's DNA expert Darren Esposito; (2) the trial court violated Nelson's right to confrontation by admitting evidence of his nontestifying codefendant's out-of-court statement; (3) the trial court failed to weigh Nelson's history of substance abuse as a mitigator; (4) the trial court improperly found CCP; (5) the trial court improperly found HAC; (6) the trial court gave the jury a vague instruction on the HAC aggravator; and (7) the death sentence is disproportionate in this case.
We address the guilt phase issues first. In issue one, Nelson argues that the trial court erred by failing to properly determine the admissibility of testimony by the State's DNA expert. State expert Darren Esposito testified that the DNA sample taken from Owens' body matched the DNA found on the box cutter, the underwear, and Nelson's shoes. Esposito stated that the same DNA match occurs in approximately 1 in 17,800 Caucasians. Esposito testified that he used a database published by the FBI to make this determination and that the FBI database is generally accepted in the scientific community. Defense counsel did not object to this assertion. However, during voir dire of Esposito, defense counsel established that Esposito did not use the FBI database for one of the figures. Esposito stated that one of the figures in the FBI *241 database is reported as .000. Esposito stated that if he used this figure, it would give the analysis a frequency of 0which Esposito stated would be too individualizing. Therefore, Esposito testified that he consulted his supervisor, who in turn consulted a population geneticist. The population geneticist suggested that a value of.03 should be used instead of 0 for that particular frequency. Esposito stated that he used the figure suggested by the population geneticist in determining his calculation of approximately 1 in 17,800. Defense counsel objected to Esposito's testimony, claiming that the population geneticist's figure was not generally accepted in the scientific community.
In Ramirez v. State, 651 So.2d 1164 (Fla.1995), this Court established that the admission into of evidence of expert opinion testimony of a new scientific principle is a four-step process, for the which the first three steps require determinations by the trial judge: (1) whether the expert testimony will assist the jury in understanding the evidence or in determining a fact in issue, (2) whether the expert's testimony is based on a scientific principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs" under the Frye[2] test, (3) whether the particular expert witness is qualified to present opinion evidence on the subject in issue, and, if the first three steps are answered in the affirmative, then (4) the judge may allow the expert to present an opinion to the jury, for which the jury can determine the credibility of the expert's opinion, which it is free to accept or reject. 651 So.2d at 1166-67; see generally Charles W. Ehrhardt, Florida Evidence § 702.3 (1997 ed.). The objection in the present case goes to the second prong of the Ramirez test whether Esposito's testimony, and specifically the figure given by the population geneticist, is based on a scientific principle that is "sufficiently established to have gained general acceptance in the particular field in which it belongs" under the Frye test. Ramirez, 651 So.2d at 1167. There was no evidence presented by the State in the present case to establish that the figure given by the population geneticist was generally accepted in the scientific community. The population geneticist did not testify and no evidence was presented to establish how he or she even arrived at the figure of .03. Therefore, we agree with Nelson that it was error for the trial court to permit Esposito to testify regarding a calculation derived from a particular source without first establishing that the source was generally accepted in the scientific community.
The parties are in disagreement as to whether the error standard enunciated in section 924.051, Florida Statutes (Supp. 1996), applies to this case. Section 924.051 was created as a result of the Criminal Appeal Reform Act of 1996, chapter 96-248, Laws of Florida. Section 924.051 became effective on July 1, 1996. The crime in this case was committed on March 10, 1995. Nelson's trial began on September 16, 1996.
Section 924.051 shifts the burden of establishing error to the moving party: "[T]he party challenging the judgment or order of the trial court has the burden of demonstrating that a prejudicial error occurred in the trial court." § 924.051(7), Fla. Stat. (Supp.1996). Prejudicial error is defined as "an error in the trial court that harmfully affected the judgment or sentence." § 924.051(1)(a), Fla. Stat. (Supp. 1996). Prior to this change, the burden was on the benefitting party to prove beyond a reasonable doubt that the error did not affect the verdict and was therefore harmless. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
We leave this matter open for further briefing and consideration. We find that under either standard, the error in this case was harmless. Assuming the new standard applies, we find that Nelson has *242 failed to carry his burden of "demonstrating that a prejudicial error occurred in the trial court." § 924.051(7), Fla. Stat. (Supp. 1996). Assuming the DiGuilio standard applies, we find that the State has met its burden of establishing beyond a reasonable doubt that the error did not affect the verdict.
We reach this conclusion for two reasons. First, had Esposito used the FBI database as opposed to the figure given by the population geneticist, the likelihood of anyone else in the general population having the same DNA match of Owens would have been zero. Thus, the figure suggested by the population geneticist was helpful to Nelson's case, not harmful, inasmuch as it did not exclude the possibility that the blood could have originated from someone other than Owens. Second, in light of the other evidence, namely Nelson's confession, we conclude that this was not reversible error.
In issue two, Nelson argues that the trial court violated his Confrontation Clause rights by admitting evidence of Brennan's out-of-court statements. At trial, Misty and Tina Porth testified regarding what Brennan said concerning the facts of the murder, including Nelson's involvement in the incident. The Porth sisters testified that both Brennan and Nelson discussed the facts of the murder with them on two separate occasions: (1) while the four were in Owens' car driving towards Daytona Beach and (2) while all four were present in a hotel room in Daytona Beach. During the two conversations, both Nelson and Brennan were present. The Porth sisters could not specify whether it was Nelson or Brennan making the statements, and generally referred to the conversations as "they said." Brennan did not testify at trial. Nelson asserts that the trial court erred in admitting the Porths' testimony concerning Brennan's statements because he was not afforded the opportunity to cross-examine Brennan regarding the statements. Nelson also alleges error because the Porth sisters could not separate what Brennan said from what Nelson said. The State counters that the statements constituted admissions by silence and were therefore admissible as an exception to the hearsay rule.
In Privett v. State, 417 So.2d 805 (Fla. 5th DCA 1982), the Fifth District Court of Appeal established the criteria for admissions by silence:
If a party is silent, when he ought to have denied a statement that was made in his presence and that he was aware of, a presumption of acquiescence arises. Not all statements made in the presence of a party require denial. The hearsay statement can only be admitted when it can be shown that in the context in which the statement was made it was so accusatory in nature that the defendant's silence may be inferred to have been assent to its truth. Daughtery v. State, 269 So.2d 426 (Fla. 1st DCA 1972). To determine whether the person's silence does constitute an admission, the circumstances and the nature of the statement must be considered to see if it would be expected that the person would protest if the statement were untrue. Tresvant v. State, 396 So.2d 733 (Fla. 3d DCA), review denied, 408 So.2d 1096 (Fla.1981).
Several factors should be present to show that an acquiescence did in fact occur. These factors include the following:
1. The statement must have been heard by the party claimed to have acquiesced.
2. The statement must have been understood by him.
3. The subject matter of the statement is within the knowledge of the person.
4. There were no physical or emotional impediments to the person responding.
5. The personal make-up of the speaker or his relationship to the party *243 or event are not such as to make it unreasonable to expect a denial.
6. The statement itself must be such as would, if untrue, call for a denial under the circumstances.
The essential inquiry thus becomes whether a reasonable person would have denied the statements under the circumstances. McCormick, Evidence, § 270 (2d ed.1972). Florida has incorporated this rule into its Evidence Code as section 90.803(18)(b), Florida Statutes (1981), which provides:
The provision of section 90.802 to the contrary notwithstanding, the following are not inadmissible as evidence, even though the declarant is available as a witness:
(18) AdmissionsA statement that is offered against a party and is:
(b) a statement of which he has manifested his adoption or belief in its truth.
Id. at 806-07; see generally Charles W. Ehrhardt, Florida Evidence § 803.18b (1997 ed.).
We begin our analysis on this issue by applying the Privett factors to the present case. The testimony of the Porth sisters established that Brennan's statements regarding the facts of Owens' murder were heard and understood by Nelson, as all four were in the car and the hotel room the two places where the discussions occurred. Nelson has not raised any claim of impediment, either physical or emotional. Finally, Brennan's statements regarding Nelson's involvement in Owens' murder were such that if untrue they would call for a denial.
We conclude that Nelson's silence in the face of Brennan's statements regarding Nelson's involvement in Owens' murder did amount to an admission by the acquiescence of Nelson in Brennan's statements. See Farina v. State, 679 So.2d 1151, 1157 (Fla.1996) ("Anthony could have taken issue with Jeffery's statements at any point, but instead either tacitly agreed with Jeffery's statements or actively discussed the details of the crime."), receded from on other grounds by Franqui v. State, 699 So.2d 1312, 1320 (Fla.1997). A reasonable person would have denied the statements under the circumstances. Hence, the Porth sisters' testimony regarding Brennan's statements was admissible in this case as an admission by silence on Nelson's part. Because there was an admission by Nelson, there can be no Confrontation Clause violation. Therefore, we find no merit to this issue.
After reviewing all of the evidence in the record, we find that there is competent, substantial evidence to support Nelson's convictions of first-degree murder and robbery with a deadly weapon.
We next turn to the penalty phase issues. In issue three, Nelson argues that the trial court failed to weigh Nelson's history of alcohol and drug abuse as a mitigating factor. There was testimony during the trial that Nelson had a history of alcohol and drug abuse.[3] However, Nelson did not identify the substance abuse as a mitigating factor when he presented the mitigators to the trial court. In Consalvo v. State, 697 So.2d 805, 818 (Fla.1996), cert. denied, 523 U.S. 1109, 118 S.Ct. 1681, 140 L.Ed.2d 819 (1998), this Court stated:
In Lucas v. State, 568 So.2d 18 (Fla. 1990), we stated: "[T]he defense must share the burden and identify for the court the specific nonstatutory mitigating circumstances it is attempting to establish." Id. at 24. Unlike statutory mitigation that has been clearly defined by the legislature, nonstatutory mitigation may consist of any factor that could reasonably bear on the sentence. The parameters of nonstatutory mitigation are largely undefined. This is one of *244 the reasons that we impose some burden on a party to identify the nonstatutory mitigation relied upon. Appellant has not met this burden with respect to mitigating circumstances numbers (1) and (4) above. Appellant neither presented these circumstances to the jury nor to the trial court. Therefore, we find no error by the trial court in not expressly considering or finding these as nonstatutory mitigators.
Accordingly, we find that the trial court did not err in failing to consider Nelson's history of alcohol and substance abuse as a separate nonstatutory mitigator. Moreover, based on our review of the sentencing order, it is clear that the trial court was aware of Nelson's history of substance of abuse: "The Defendant himself related a personal history of alcohol, drug as well as sex abuse by his step-father." Thus, we find no merit to this issue.
In issue four, Nelson argues that the trial court erred in finding CCP. Nelson asserts that there was no careful plan to commit this crime. Additionally, Nelson contends that there was a pretense of moral or legal justification based on the Owens' alleged sexual battery of Tina Porth, Nelson's repeated sexual abuse by his father, and Nelson having been told to leave home on the morning of the murder.
The law is settled that in order to find CCP, it must be established that (1) the murder was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage, (2) the defendant had a careful plan or prearranged design to commit murder before the killing, (3) the defendant exhibited heightened premeditation, and (4) the defendant had no pretense of legal or moral justification. See Jackson v. State, 648 So.2d 85, 89 (Fla.1994). In the present case, the trial court made the following findings in the sentencing order regarding CCP:
The Defendant in this case made a plan in advance and lured the victim to the scene of his murder. The Defendant testified live and by video taped confession that he calmly discussed with his Co-Defendant methods by which they might entice the victim out of his car so they could kill him.
The Defendant hit the victim, then chased him down and continued the beating. The Defendant then stopped and discussed with the Co-Defendant the victim's offer to give them what they wanted and make up a story in return for his life. Both decided the victim must die. The victim was cut at the throat with a box cutter, bound, and dragged into the brush where he was beaten some more and finally left to die.
These actions were the product of calm and cool reflection and were not prompted by emotional frenzy, panic or a fit of rage.
The death of Tommy Owens was the result of a careful plan made well in advance of the commission of the offense thus indicating a heightened state of premeditation.
Since these facts were all admitted by the Defendant and the evidence fully supports his admission, the aggravating factor that the capital felony for which the Defendant is to be sentenced was committed in a cold and calculated and premeditated manner without any pretense of moral or legal justification has been proved beyond a reasonable doubt.
First, Nelson argues that the calculation element of Jackson was not proved beyond a reasonable doubt because Nelson did not carefully plan to murder Owens. We disagree. In his taped confession, Nelson stated that he and Brennan discussed a scheme to kill Owens and take his car, both the day before the murder and the day of the murder. When Nelson took the stand to testify, he admitted that he and Brennan talked about killing Owens prior to the murder. Based on this evidence, we find that the calculated plan element exists beyond any reasonable doubt.
*245 Further, we reject Nelson's claim that he committed this murder with a pretense of legal or moral justification. A pretense of legal or moral justification is "any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide." Walls v. State, 641 So.2d 381, 388 (Fla.1994) (footnote omitted). In the case at bar, there were allegations that Owens forced Tina Porth to engage in oral sex with him, and that Nelson was aware of these allegations. There was also evidence that Nelson's stepfather sexually abused Nelson, and that on the day of the murder, Nelson was told to leave home by his mother after he resisted sexual advances by his stepfather. Viewing this evidence in the light most favorable to Nelson, it still would not constitute an excuse, justification, or defense to the homicide. See Hill v. State, 688 So.2d 901, 907 (Fla.), cert. denied, 522 U.S. 907, 118 S.Ct. 265, 139 L.Ed.2d 191 (1997) ("In this case, the trial judge properly rejected the proposition that by killing persons in order to prevent them from performing legal abortions, Hill acted under a pretense of moral justification."); Dougan v. State, 595 So.2d 1, 6 (Fla.1992) ("One of [the rules by which every civilized society must live] must be that no one may take the life of another indiscriminately, regardless of what that person may perceive as justification."). Hence, we conclude that the trial court correctly found that CCP was established in this case.
In issue five, Nelson asserts that the trial court erred in finding HAC. We disagree. In order for HAC to apply, the crime must be both conscienceless or pitiless and unnecessarily torturous to the victim. See Zakrzewski v. State, 717 So.2d 488 (Fla.1998); Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996), cert. denied, 522 U.S. 825, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997); Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992). The trial court made the following findings in the sentencing order:
When the victim got out to look, the Defendant hit the victim with the metal baseball bat. The facts show that the Defendant hit the victim twice before the victim tried to run away. The Defendant then chased the victim down and struck him again. While on the ground the victim asked the Defendant not to hit him any more and told him to take the car and anything else he wanted. The Defendant repeatedly told the victim to "shut up." The victim then offered to make up a story and let the Defendant and the Co-Defendant take everything in return for his life. The Defendant then beat the victim again to knock him unconscious so that the Co-Defendant could slit the victim's throat. As the Co-Defendant began to cut the victim's throat, the victim cried out that he was not out yet whereupon the Defendant hit the victim again with the bat. After the victim's throat was cut, the evidence shows that he was still alive and the Defendant then hit the victim at least four more times. This ordeal lasted over an undetermined period of time where the victim suffered multiple blows to the head. The evidence shows that he was conscious and was aware of his impending doom when he asked to be knocked out before his throat was to be cut.
Based on these facts, which were admitted by Nelson and supported by the record, the trial court did not err in finding Owens' murder to be heinous, atrocious, or cruel. See Zakrzewski; Hannon v. State, 638 So.2d 39, 43 (Fla.1994).
In issue six, Nelson argues that the instruction given to the jury by the trial court regarding the HAC aggravator was vague. We disagree. The jury was given the HAC instruction found in the Florida Standard Jury Instructions in Criminal Cases. We have previously rejected claims that this instruction is unconstitutionally vague. See Hall v. State, 614 *246 So.2d 473, 478 (Fla.1993); Preston v. State, 607 So.2d 404, 410 (Fla.1992).
In his final issue, Nelson argues that the death sentence in this case is disproportionate. We disagree. In reviewing the proportionality of a death sentence, we must "consider the totality of the circumstances in a case and ... compare it with other capital cases." Terry v. State, 668 So.2d 954, 965 (Fla.1996). In the present case, the trial court found three aggravators (HAC, CCP, and committed in the course of a robbery), one statutory mitigator (age of eighteen), and a number of nonstatutory mitigators. See supra note 1. We have upheld the death penalty in other cases involving similar circumstances. See Sliney v. State, 699 So.2d 662 (Fla.), cert. denied, 522 U.S. 1129, 118 S.Ct. 1079, 140 L.Ed.2d 137 (1998) (upholding the death penalty where the victim was beaten in the face with a hammer and stabbed with a pair of scissors and where there were two aggravators (commission during a robbery and avoiding arrest), two statutory mitigators (age and lack of criminal history), and a number of nonstatutory mitigators); Hayes v. State, 581 So.2d 121 (Fla.1991) (upholding the death penalty where there were two aggravators (CCP and commission during a robbery), one statutory mitigator (age), and other nonstatutory mitigators). Thus, we conclude that the death penalty is not disproportionate in this case.
Accordingly, for the reasons stated in this opinion, we affirm the convictions and sentences in Nelson's case.
It is so ordered.
HARDING, C.J., SHAW and WELLS, JJ., and OVERTON and KOGAN, Senior Justices, concur.
PARIENTE, J., concurs specially with an opinion, in which SHAW and ANSTEAD, JJ., and KOGAN, Senior Justice, concur.
PARIENTE, J., specially concurring.
I concur in the majority opinion, including the imposition of the death penalty. I write separately to address the mitigating evidence in the record and the need for a uniform rule regarding presentence investigation reports in capital cases.
An understanding of the statutory and nonstatutory mitigating factors in a death penalty case is critical to a proper performance of our constitutionally required proportionality review. As in many death cases I have reviewed during my time at this Court, in this case we have not had the benefit of a presentence investigation report, school records, treatment records, or other information. This additional information would more fully assist us in performing our proportionality review and in assessing the strength of the evidentiary foundation for the mitigating factors.
The time has come to decide whether a uniform rule should be adopted requiring a presentence investigation and report in all capital cases. A presentence investigation and report might be specially tailored in a death case to assist in evaluating the educational, psychological and mental history of the defendant. Our goal is to enhance the decision-making of both the trial court that imposes the sentence and this Court in reviewing that decision and in performing our independent proportionality review. As Justice Anstead observed: "Informed decision-making is essential to the integrity of the judicial sentencing process." Farr v. State, 656 So.2d 448, 451 (Fla.1995) (Anstead, J., concurring).
Since 1979, members of this Court at various times have suggested that we adopt a uniform rule requiring a presentence investigation and report in all capital cases. See, e.g., Hargrave v. State, 366 So.2d 1, 8 (Fla.1978) (Hatchett, J., concurring in part and dissenting in part); Farr, 656 So.2d at 450-51(Anstead, J. concurring). In fact, in Farr, the majority stated that "we do strongly believe that trial courts would be wise to order presentence investigations in at least those cases in *247 which the defendant essentially is not challenging imposition of the death penalty." 656 So.2d at 450.
Before adopting such a rule, it would be prudent to obtain input from all interested parties, including the trial judges who try capital cases. The Chief Justice has recently appointed a special committee to study issues unique to capital cases, and we have now taken the important step of referring this issue to that committee to report back to the Court with its proposed recommendations, after receiving input from the Criminal Rules Committee as well as other interested individuals and groups.
Turning to the mitigating circumstances present in the record in this case, none of these circumstances provide an "excuse" for this crime. Neither the judge nor the jury determined that the mitigating factors outweighed the aggravating factors. However, one has only to consider the unemotional, matter-of-fact way that Nelson confessed to the murder on videotape to realize that something in this eighteen-year-old's life had gone seriously wrong, long before he committed the brutal crime in this case.
The examining psychologist testified at the penalty phase that Nelson had the emotional maturity of a twelve- or thirteen-year-old, although he was nineteen years old chronologically at the time of the examination and eighteen at the time of the crime. He found Nelson to be a "particularly bright young man," but concluded that his potential was never developed because of an "absence of encouragement and absence of discipline as a youngster with respect to going to school, completing work and parental following up on what was necessary to become a meaningful member of society."
Because of a "markedly dysfunctional family," Nelson "never learned proper rules of how to conduct himself in the real world." Nelson became involved in crime as early as the age of eight and was first arrested at age eleven. He found himself in "constant trouble with the law, burglarizing, stealing cars, and so on. So right from the start, we saw a young man who already had these disturbances long before this particular event occurred."
Nelson's father was an alcoholic and drug addict who eventually abandoned the family. There were incidents of abuse between the mother and father, some of which Nelson witnessed at a young age. The father eventually withdrew from society, moving from living in a box to living in a tent, where he was living when he testified at trial.
The psychologist opined that there was a family history of schizophrenia, or some similar significant mental disorder, on the paternal side. While incarcerated after the crime, Nelson was treated for auditory hallucinations. He had a history of drug and alcohol abuse and was twice sent to a drug treatment center prior to the crime.
Most disturbingly, Nelson alleged that he suffered long-term sexual abuse at the hands of his stepfather, which continued even after he reported the abuse to his mother. He felt that his mother, whom he adored, never cared for him. He told the testifying psychologist that on the day of the offense he became very angry and left home because of continued sexual advances by his stepfather, without intervention by his mother.
Although an understanding of what went wrong in this eighteen-year-old's life might not have saved Nelson from the imposition of the death penalty, it could provide valuable insight into how, through early intervention and prevention efforts, the outcome might be altered for other children who have been neglected and abused before it is too late.
SHAW and ANSTEAD, JJ., and KOGAN, Senior Justice, concur.
NOTES
[1] The following nonstatutory mitigators were presented during the penalty phase: (1) Nelson gave a voluntary confession, (2) Nelson was not the person who killed the victim, (3) death was caused by the codefendant Brennan, (4) Nelson suffered from a deprived childhood, (5) Nelson's childhood saddled him with emotional handicaps, (6) outside influences saddled Nelson with emotional handicaps, (7) Nelson suffered great situational stresses leading up to the time of the homicide, (8) Nelson was suffering emotional turmoil before and at the time of the homicide, (9) Nelson's anger stems from circumstances beyond his control, (10) Nelson suffered physical, mental, and sexual family abuse, (11) Nelson has no prior criminal convictions for violent felonies, (12) the homicide was committed for emotional reasons, (13) there was a conditional guilty plea subject to a life sentence which was refused by the State, (14) Nelson has potential for rehabilitation in prison, and (15) the death penalty as applied to Nelson is disproportionate.
[2] Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923).
[3] Nelson testified that he was not under the influence of alcohol or drugs on the night of the murder.