# Supreme Court of Florida

_____

No. SC17-2062
_____

**MESAC DAMAS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

December 28, 2018

PER CURIAM.

This case is before the Court on appeal from a judgment of convictions of first-degree murder and six sentences of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons discussed below, we affirm the convictions and sentences.

## FACTS AND PROCEDURAL BACKGROUND

*Overview*

Appellant Mesac Damas (Damas) was indicted on six counts of first-degree premeditated murder for the killing of his wife, Guerline, and their five children in September 2009. The names and ages of the children were: Meshach (nine years

old), Maven (six years old), Marven (five years old), Megan (three years old), and Morgan (nineteen months old). Damas killed the victims at their Naples home by cutting their throats. Damas admitted to a reporter from the *Naples Daily News* that he killed his wife and children, and he also gave three statements—two were given to a special agent of the United States Department of State Diplomatic Security Service and a third was given to members of the Collier County Sheriff's Office.[1] *Miranda*[2] warnings were provided to Damas before each statement and Damas waived his rights. Most of the facts with respect to the crimes were compiled from these statements.

During the trial court proceedings, Damas expressed a desire to represent himself. However, after a *Faretta*[3] inquiry, the trial court denied the request. Damas pleaded guilty to the crimes and waived his right to a penalty-phase jury. He also waived his right to present evidence in mitigation. After allowing defense

---

1. The statements to the special agent were only summarized in writing by the agent, but the statement to Collier County law enforcement was both recorded and transcribed. Where the transcription differs from the recording, we rely upon the recording as the most authoritative source.

2. *Miranda v. Arizona*, 384 U.S. 436 (1966).

3. *Faretta v. California*, 422 U.S. 806 (1975).

counsel to make a presentation pursuant to *Koon v. Dugger*, 619 So. 2d 246 (Fla. 1993),[4] the trial court imposed sentences of death for each of the murders.

*Background, the Crimes, and the Confessions*

Damas and Guerline dated for many years before they married in April 2006.  Meshach, Maven, Marven, and Megan were born prior to the marriage, while Morgan was born after the marriage.  According to Damas, he and Guerline began to argue after the marriage.  He became jealous and suspected Guerline of having an affair.  He visited her job and checked her cellular telephone.  On January 2, 2009, during an argument about her purported unfaithfulness, Damas slapped Guerline while she was holding infant Morgan, and Guerline dropped the child on the floor.  Guerline called the police, and Damas was arrested and charged with misdemeanor battery.  He was given a bond, but was ordered to have no contact with Guerline as a condition of his release.[5]  Nonetheless, he sent her

---

4. *See Koon*, 619 So. 2d at 250 ("When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be.  The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.").

5. In the months following the misdemeanor charge, Damas attended parenting classes and anger management classes at the David Lawrence Center in an effort to be allowed to see the children.

flowers almost every day. Further, he would use his key to enter the residence so that he could apologize to Guerline and see the children.

According to Damas, as time passed, Guerline became concerned because the Department of Children and Families (DCF) "got involved" as a result of the domestic violence incident and was "trying to take the kids away from her." Guerline changed the locks so that Damas could no longer enter the residence, but Damas would drive by after his restaurant shift ended at 3 a.m., using a friend's car so the police would not know he was violating the no-contact order. He would sit in the car, watching Guerline and thinking about the children. One day, when he "couldn't take it no more," he broke a window while Guerline was home and entered the residence to see the children. Guerline and the children eventually moved out of the residence where the domestic violence incident occurred and into the townhouse where the murders occurred.

The no-contact order was subsequently lifted and, toward the end of March 2009, Guerline allowed Damas to move in with her and the children.[6] Damas pleaded no contest to the battery charge and was placed on twelve months' probation. Although Guerline allowed Damas to move in, she told him she did not forgive him and she planned to divorce him. Guerline informed Damas that her

_____

6. According to Damas, Guerline asked the court to lift the no-contact order because the children loved him and were asking for him.

- 4 -

mother stated that if she ever took Damas back, she (the mother) would never speak to Guerline again.  When Damas asked Guerline if she would leave him, she stated, "I don't know what I'm going to do.  My mom [is] probably right . . . like I told you before I'm going to leave you.  I'm going to divorce you."  Damas responded, "Baby let me tell you something.  . . .  If you ever say that again I will kill your mom.  I will kill you.  I will kill myself."[7]

On Wednesday, September 16, 2009, Guerline informed Damas that if he struck her again, she would make sure he spent the rest of his life in prison and he would never see the children again.  Contemplating Guerline leaving him for someone else and not being allowed to see his children, Damas thought about killing himself and her:

> [A]nd then that's when the devil start coming out of me.  He was like, "Oh, why don't you just kill yourself?  Kill her and then kill yourself" you know, "Let your parents, whatever, take care of the kids."  But I was like, "But I love the kids and when I die how am I going to know if they [are] okay."

Also that day, a DCF employee visited and met with Guerline without Damas.  Damas recounted to the special agent his belief that "[t]hey were setting me up for

---

7. This comment was made by Damas in his statement to Collier County law enforcement.  However, his statement to the special agent reflects a similar comment:  "Her mom and sister been talking [to] her.  Saying to divorce [me].  I said 'Divorce me?  I f[***]ing kill you!' "  It is not clear if these are comments that were made at different times, or if Damas was paraphrasing the same comment.

failure. [Guerline] was asking her how she can divorce me. . . . I was so pissed off . . . the fact [that] she betrayed me like that." (fourth alteration in original). That night, Guerline informed Damas she would help him finish the probation classes, and then she would divorce him.

On the morning of Thursday, September 17, 2009, Damas followed Guerline to her job, leaving the children at home alone. Guerline and the store manager threatened to call the police, but Damas said, "If you call the cops they're going to arrest me, they're going to arrest you too because both of us left the kids alone at the house. They're going to take the kids away from us. I know you love the kids too, right?" Guerline returned home after working less than four hours. She asked Damas to sign some papers that had arrived in the mail. Before she left the townhouse to return to work, she stated she would not come home that evening because she feared Damas "might push me or whatever, beat . . . me." Damas responded, "Baby, I'm not going to do anything to you. I love you. You know? It's okay. . . . It's alright. If I touch you I go to jail; you know."

Guerline returned to the townhouse that afternoon on her work break. A friend who was visiting Damas at the time witnessed an argument between the two before Damas left for his work shift, using the friend's vehicle rather than taking

his own.[8]  The friend agreed to stay and watch the children because Guerline also left to return to work.  At approximately 7 p.m., Guerline arrived home, and the friend remained to speak with her.  During his shift, Damas complained of a headache and was allowed to leave early.  He "clocked out" at 8:42 p.m.  Damas informed the special agent that once he left the restaurant, he was considering various scenarios:

> I said I would go and kill her and myself.  But if I kill her[,] custody of the kids would go [to] her mom.  So I wanted to kill her mom so my mom would have custody.  I [was] talking to myself in my car.  I said what if I kill my kids and myself?  But what about her?  She will marry again!  What if I just kill her?  But if they find me[,] they will take my kids away from me.

Around 9 p.m., Damas's friend observed his own vehicle drive past the townhouse, turn around, and leave.  The friend entered Damas's Yukon and followed Damas, flashing the lights of the Yukon.  When Damas stopped, the friend asked Damas what was wrong, and Damas replied that he thought Guerline was with another man.  The friend and Damas swapped vehicles, and the friend observed Damas drive away.  At approximately 10:30 p.m., Damas purchased duct tape, a filet knife, and chewing gum.

---

8. The friend explained to a Collier County detective that Damas left his GMC Yukon at the townhouse so the friend could load music equipment into it.  However, Damas provided an additional reason for taking the friend's vehicle—he wanted to check on Guerline while she was at her job without being recognized.

On Saturday, September 19, 2009, Guerline's family filed a missing person report with the Collier County Sheriff's Office and requested a welfare check for Guerline and the children. The family was concerned due to the history of domestic violence between Damas and Guerline and the children, and the fact that Guerline had not reported to work, which was out of character for her. The children also missed school on Friday. Officers met Guerline's family at the townhouse to conduct a welfare check, and the landlord unlocked the front door. Upon entry, the officers observed a red substance that appeared to be blood leaking from the closed door of a room under the stairway. Believing a violent crime had been committed and the suspect might still be present, the officers withdrew and requested backup.

Upon reentry by law enforcement, they opened the door under the stairs and found Guerline deceased, laying on the floor of a small bathroom with a large area of dried blood beneath the upper part of her body. Her head was covered with a black trash bag. Underneath the bag, her neck and mouth had been bound with duct tape. The upper half of her body was bound with so much duct tape that it was impossible to discern what she was wearing from the waist up. Her arms were behind her back and her wrists and hands, palms facing outward, were bound extensively with duct tape. Her legs were bound with duct tape from just above

her knees to just above her ankles. Her torso and hands were also loosely wrapped in an electrical cord. Her throat had been cut through the duct tape.

Law enforcement proceeded to the second floor of the townhouse to check on the welfare of the children. In one bedroom, law enforcement found Meshach—the oldest child—deceased on the bed with his throat cut. The knife wounds nearly encircled his neck. The bed was broken. In another bedroom, law enforcement found the four remaining children deceased, also with their throats cut. The lacerations to five-year-old Marven's throat were so deep that he was nearly decapitated. Neither Damas nor his vehicle was at the townhouse.

Law enforcement eventually tracked Damas's vehicle to Miami International Airport, where he had entered the airport parking garage at 6:40 a.m. on September 18, 2009. Damas paid cash for a one-way ticket to Port-au-Prince, Haiti; the flight departed at 9:50 a.m. on September 18. He was subsequently apprehended in Port-au-Prince by the Haitian National Police. While being escorted by law enforcement, a reporter from the *Naples Daily News* who was in Haiti asked Damas, "Did you kill your family?" Damas replied in the affirmative. Damas also stated that he wanted "death right away" so that he could be buried with his family. When asked what led him to kill his family, Damas stated that Guerline's mother made him do it, referencing "her mom's spirit, whatever she's—she's serving, whatever she worships." Damas said he planned to commit suicide after the

killings, but he did not have the courage to do so. Damas also stated that he intended to turn himself in, but went to Haiti to say goodbye to his family.

During his statements to the special agent and Collier County law enforcement, Damas described what happened on the night of the murders, though the stories are not identical. He stated that after swapping vehicles with his friend, Damas parked his car by the community swimming pool and proceeded to the back of the townhome. He watched Guerline through the screened-in lanai for more than one hour while she spoke on her cellular telephone. According to Damas, she was laughing and looked happy. At approximately 12:30 a.m., he tore off the screen door to the lanai and entered the townhouse through the sliding glass door, which Damas knew he could open because it was not functioning properly. When Guerline saw him, she screamed and told him not to touch her. Damas punched her and, at that time, he knew he "was gonna go to jail." Damas stated that Guerline was fighting him in the kitchen, "trying to get out [to call] the cops or whatever. Call a neighbor." According to Damas, at that point, he pulled her hair back and cut her throat from behind with a filet knife.[9]

_____

9. Although Damas contended that he cut Guerline's throat in the kitchen, none of the crime scene photographs reflect significant amounts of blood in the kitchen. Instead, there was a large amount of blood in the bathroom where Guerline was discovered. Further, in his statement to Collier County law enforcement, Damas claimed he duct taped Guerline after slicing her throat; however, this is inconsistent with the testimony of the medical examiner that the lacerations to Guerline's throat were made through the duct tape, indicating she

- 10 -

Damas bound Guerline extensively with duct tape so that she could not call out and because she was "trying to make noise with her feet that the neighbor next to us can hear" through the common wall. Because she was still struggling and he had used all the tape, he further bound her with an extension cord. According to Damas's statement to the special agent:

> I said I gonna let you live . . . I won't kill you but I kill all the kids in front of you! I said I will let you go but I burn the house with me and kids in it. She want to talk. I remove duct tape . . . she said "I love you so much." I said why you lying to me? She said please don't hurt the children. I said if you go I looking at 6 years because [you] will call the cops on me.

(First and second alteration in original.) According to Damas's statement to Collier County law enforcement, he dragged Guerline into the bathroom in order to contain the blood. He then engaged in the following thought process:

> And I was trying to, "What am I going to do? Run, call the cops? Say I killed my wife or something."
> . . . .
> I love my children to death. I'm going to jail for life.
> . . . .
> Death penalty, whatever, electric chair. I'm thinking, thinking. One o'clock in the morning, two o'clock in the morning. I'm thinking. I got the knife in my hand still. I said, "Uh I'm to slice my throat too." I said, "I'm gonna suffer before I f[***]ing die. I can do it." I wasn't going to kill the kids, man. I still had them to survive, you know, let them live. So the devil come to me and say, "Who's going to taking care of kids?"

---

was bound before her throat was cut. Moreover, the fact that Damas told the special agent that Guerline spoke to him after she was bound belies Damas's assertion that her throat was cut before she was duct taped.

- 11 -

Damas proceeded upstairs, where, in his own words, he cut the children's throats "one by one." He first killed Megan, the three-year-old. Damas said that after he killed Megan, he heard a voice saying, "Good job in doing it." According to Damas, when he said he could not continue, a voice told him, "Yes you can. Keep doing it." He then killed Marven, the five-year-old, and Maven, the six-year-old. According to Damas, he decided he could not continue, so he started packing, planning to leave Meshach and Morgan alive. However, according to Damas, when he proceeded downstairs:

> I see a bunch of blood, my wife laying down. I was like, "Oh my God." I digged up carpet and I cover the blood. There was blood everywhere on my feet. I was like, "Oh my goodness. I'm going to jail for the rest of my life. They will give me death penalty." . . . And then the voice said, "You got two more left. You're going to die anyway. You're going to leave those two behind? Her mom probably have custody of them." I said, "Hell no I don't want her mom get custody. If I have chance to kill her mom I will drive there or, whatever. Go to Haiti, kill her mom." He was like, "Well her mom is gonna get custody [of] them." I said, "Hell no" and then I went upstairs and cut the little one.

Damas stated that nineteen-month-old Morgan was "the easiest one to die." However, nine-year-old Meshach struggled. After cutting Meshach's throat, Damas watched him bleed to death.

After the murders, Damas changed his bloody clothing, placed the knife—now bent—in a nightstand in the master bedroom, finished packing a suitcase, removed money from Guerline's wallet, and drove to the Miami airport where he

purchased the one-way ticket to Port-au-Prince. He stated that before he left the townhouse, he contemplated suicide again, but could not bring himself to cut his own throat. Instead, he planned to drive into the path of another vehicle. However, he ultimately continued to the airport.

Damas stated to the special agent, "I know what I did was wrong. Bad spirits made me do it." Damas stated that his mother-in-law practices Vodou, and that she "has been doing voodoo[10] on my ass ever since we been making children." According to Damas, because he and Guerline were engaging in premarital sex, Damas was no longer allowed to be president of his church youth group, and he left the church. As a result, he did not "have any protection from my God no more. So anything can happen to me."

The parties stipulated that the cause of Guerline's and the children's deaths was sharp force injuries to the neck, and the deaths were ruled homicides. On September 5, 2017, Damas pleaded guilty to six counts of first-degree premeditated murder, waived his right to a penalty-phase jury, and waived his right to present evidence in mitigation.

---

10. The terms "Vodou" and "voodoo" are used interchangeably in the record.

*Sentencing Hearing*

During the sentencing hearing, the trial court first allowed the State to present evidence to establish the existence of one statutory aggravating factor beyond a reasonable doubt. The State presented Dr. Manfred Borges, the Deputy Chief Medical Examiner for the District 20 Medical Examiner's Office. Dr. Borges testified that Meshach Damas exhibited "classic defensive injuries" on his hand and sharp force injuries to his shoulders which could have been defensive injuries in the way of repelling an attack. Meshach suffered the injuries before he became unconscious, and the fact that the bed he was laying on was broken was indicative of a struggle. Dr. Borges testified that five-year-old Marven Damas exhibited superficial defensive injuries on his hands. Dr. Borges also noted a long cut down Marven's face, from the cheek almost to the jaw. He would not describe this as a defensive injury, but opined that it could have been "just an attempt to get control of the victim . . . and get the bladed instrument into position."

While Dr. Borges could not state with any degree of medical certainty how long it took the victims to die from the sharp force injuries inflicted, it was not instantaneous. Nonetheless, death would have been very rapid once the blade reached the major blood vessels in the neck. Dr. Borges testified that for certain victims, "initiation of the event" to actual death could have lasted minutes. He gave as examples the extensive binding of Guerline with duct tape, during which it

was assumed she was trying to defend herself, and the struggling by Meshach, who sustained "injuries all around the neck."

The State also presented Collier County crime scene investigator Jessica Gerster, who recovered a filet knife from a nightstand in the master bedroom of the townhouse where the murders occurred. Over 180 exhibits were entered into evidence, including a Pre-Sentence Investigation (PSI) evaluation, crime scene and autopsy photographs, and Damas's three statements.

The trial court concluded that, with respect to Guerline, the aggravating factors that the murder was especially heinous, atrocious, or cruel (HAC) and the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) had been established beyond a reasonable doubt. With respect to the children, the court found the aggravating factors that the victims were under the age of twelve (under the age of twelve), and the victims were particularly vulnerable because Damas stood in a position of familial or custodial authority over them (familial/custodial authority) had been established beyond a reasonable doubt. Based upon these "prerequisite findings," the court determined that victim impact testimony could be presented.

Guerline's brother, Mackindy Dieu, read a victim impact statement. Dieu stated he did not want his "sister's legacy to be a domestic violence statistic."

Rather, he wished for people to know "who she was to me and my family and what she could have been to this community." Dieu stated:

> Family was most important to Guerline. When others had nothing, she would always give of herself to ensure everyone was taken care of and happy. No matter what struggles she went through in her own life, her thoughts were always of others first.
> She had a laugh and a smile that was infectious. Her presence could fill a room with love and kindness. When you're with Guerline, you knew you were important and loved.

Dieu described how Meshach wanted to play football, how Marven was a budding speller, how Maven was a promising artist, and how Megan and Morgan "were so young that their opportunities were limitless." However, "[w]hat should have been a legacy of our family has been destroyed. An entire generation is gone. What could have been is gone."

The court next afforded the defense the opportunity to present evidence that the aggravating factors presented by the State do not outweigh the mitigating circumstances. The defense presented Dr. Elizabeth McAlister, who received a Ph.D. from Yale University in American Studies, with a specialization in Caribbean religion, and Haiti in particular. Dr. McAlister testified that Haiti is the poorest country in the western hemisphere. Damas spent his early years in a small Haitian village, and he grew up during the last decade of the violent regime of Jean-Claude "Baby Doc" Duvalier. During the regime, a secret police force encouraged paranoia in the population. Individuals were routinely assassinated in

the streets, people who dissented from the government disappeared, and a climate of fear permeated the country. Damas informed Dr. McAlister that both of his parents were members of this secret police force, which is unusual.

Damas explained that his father left the family to move to the United States when Damas was five years old. As a result, Damas's mother relocated the family to Port-au-Prince to live with members of both the mother's and the father's families. Damas informed Dr. McAlister that he was beaten regularly as a child by the father's brothers, and Dr. McAlister testified "corporal punishment is routinely used to create children who listen to their parents and who are respectful." When Damas was ten years old, his mother moved to the United States, leaving him with his grandmother and his uncles.[11] Family members would move in and out, creating an "unstable family situation."

According to Dr. McAlister, the blending of the families in Port-au-Prince created religious tensions. Members of the mother's family are largely practitioners of Vodou. Members of the father's family had converted to evangelical Christianity. Dr. McAlister explained that in Vodou, all living things and inanimate objects contain a spirit or spiritual force, there are a series of spirits who are available for protection and guidance, and family members inherit these

---

11. Damas moved to the United States when he was nineteen years old.

spirits. The spirits are interested in justice, so when a conflict is present, spiritual force can be engaged to achieve justice. Further, individuals can use spiritual force to protect themselves and sometimes for aggressive purposes. Haitian evangelical Christians believe the Vodou spirits are real; however, instead of being inherited family spirits that can help, Haitian evangelical Christians believe the spirits are demonic. Damas's mother converted from Vodou to evangelical Christianity, and she was "very attuned to aggressive spiritual attack. . . . So the whole family on both his mother['s] and father['s sides] begin to see life through an evangelical lense [sic] where the devil is always trying to attack the family."

Dr. McAlister testified there is an understanding in Vodou that an individual can "throw a force" onto others to attack them, and this force pushes those who are attacked to do things they otherwise would not have done. There is also the concept of sending the spirit of a recently deceased person to persecute and attack a person so that the person attacked self-destructs or wastes away and dies. Damas told Dr. McAlister he had been cursed by his mother-in-law and a co-worker with whom he had a dispute, who came from a Haitian village known for its "aggressive magic in the invisible world."[12] Dr. McAlister reiterated Damas's belief that

_____

12. Further, Damas had girlfriends outside of the marriage to Guerline and some of these girlfriends were married. Therefore, Dr. McAlister conveyed Damas's belief that "it would be very likely if the boyfriends or husbands of the outside women had also engaged in magic . . . against him."

because he left the church, he no longer had Jesus to protect him from the demonic attacks. She concluded that Damas's "fear of sorcery and malevolent magic played a huge role in his behavior" because "he feared that people were sending evil spirts to attack him." However, she also acknowledged that Damas informed law enforcement he killed the children because he could not accept Guerline's mother receiving custody of them.

The other witness presented by the defense was Dr. Mark Rubino, a neurologist. Dr. Rubino reviewed Magnetic Resonance Imaging (MRI) and Positron Emission Tomography (PET) scans performed on Damas in 2014. He testified the MRI revealed several abnormalities. Dr. Rubino noted portions of Damas's brain were atrophied and the ventricles of Damas's brain were larger than they should be, with the right ventricle being larger than the left. According to Dr. Rubino, the PET scan revealed decreased activity with respect to how sections of Damas's brain were using available energy in the form of glucose. Dr. Rubino testified, "Not only is the structure telling you that something is not right, you have function telling you something is not right."

Dr. Rubino reviewed the emergency medical services (EMS) report for a 2009 car accident that occurred prior to the murders in which Damas drove off the road. He noted Damas was unconscious when discovered, so it was not clear if the accident caused a loss of consciousness or if a loss of consciousness caused the

accident. Although Dr. Rubino noted the accident could have contributed to Damas's brain abnormalities, he opined there were too many abnormalities to be caused by the accident. Dr. Rubino ultimately concluded that Damas's MRI was most compatible with schizophrenia, which involves "a total misread of reality." He further explained that the abnormalities in Damas's brain could have impacted his behavior in the form of impaired judgment, diminished impulse control, lack of planning, impaired decision making, and a diminished ability to understand what is right and wrong.

On cross-examination, Dr. Rubino acknowledged that during his earlier deposition, he did not mention schizophrenia as a potential issue. He also conceded that he is not a neuropsychiatrist, a neuropsychologist, or a behavioral neurologist. When the State noted the hospital records from the car accident contained no indication that Damas suffered a concussion and that he was discharged after only two-and-one-half hours, Dr. Rubino responded, "The evidence [of a concussion] is within the records," in that Damas suffered "[h]eadache, spots in his vision, agitation, [and] disorientation." Finally, the State returned to Dr. Rubino's testimony that Damas's "right brain has less in it than his left [brain] because the ventricle is large." Dr. Rubino confirmed the right side of the brain controls insight, social skills, impulse control, and planning. The following dialogue then occurred:

STATE:  Dr. Rubino, you indicated that the Defendant showed an example of lack of planning both based upon the date that the crime occurred and the date that he fled the United States.  Do you recall that in your deposition?

DR. RUBINO:  Yes.  I said it [sic] *about a week or ten days*[,] *along those lines*.[13]

STATE:  Okay.

DR. RUBINO:  *Several days.*

STATE:  Murdering his wife and five children and then leaving the United States ten days later, is that indicative of lack of planning on Mr. Damas'[s] part?

DR. RUBINO:  Certainly for a first-degree murder where you plan it, you also plan your get-away if you're a good planner.

(Emphasis added.)

During the *Koon* portion of the hearing, defense counsel stated they had discussed with Damas evidence of possible mitigating circumstances they would have presented had Damas not waived the presentation of mitigation, and described that evidence.  After the presentation, Damas handed a note to counsel which stated he would not speak for three days.  When the court asked Damas if defense counsel had reviewed the additional mitigation with him and whether he desired to have it presented, Damas refused to answer.  The next day, Damas still refused to verbally respond.  However, Damas eventually wrote on a sheet of paper, in pertinent part, "[*G*]*o ahead.  Continue your work.*  May my blood be

---

13.  As previously discussed, Damas was in Haiti within twelve hours of the murders.

- 21 -

upon your shoulder. C.O.G." (Emphasis added.)[14] The court determined that based upon the totality of the circumstances, the requirements of *Koon* had been met, and the sentencing process would proceed. When offered the opportunity to make a statement to the court, Damas remained silent. He also declined to review the PSI evaluation that had been prepared.

*Sentencing Order*

On October 27, 2017, the trial court imposed six sentences of death for the murders of Guerline, Meshach, Maven, Marven, Megan, and Morgan. With respect to the six victims, the trial court found the prior violent felony and CCP aggravators, and afforded both great weight. The trial court found the HAC aggravating factor with respect to Guerline, Meshach, and Marven, and gave great weight to the aggravator. In addition to other facts, the court noted that Damas bound Guerline with nearly fifty-five yards of duct tape to keep her from fighting back and stated, "That act required time." With respect to the five children, the trial court found the under the age of twelve and familial/custodial authority aggravating factors, and afforded both great weight.

With respect to the mitigating circumstances asserted by the defense, the trial court issued the following findings: (1) the murders were committed while

_____

14. Damas has previously referred to himself as "Child of God."

- 22 -

under the influence of an extreme mental or emotional disturbance (not supported by the greater weight of the evidence); (2) capacity to appreciate the criminality of conduct or to conform conduct to the requirements of the law was substantially impaired (not supported by the greater weight of the evidence); (3) history of mental illness (some weight, but noting "[t]here is nothing in the record to support a finding that Defendant had 'a long and well-documented' history of mental illness before the murders"); (4) never received treatment for his mental illness (some weight, but finding "it is more likely than not that Defendant behaved purposefully during . . . evaluations . . . so as to be found incompetent"); (5) provided information leading to resolution of the case (some weight); (6) positive qualities, including being a hard worker, taking responsibility, and expressing some remorse (some weight); (7) amenable to rehabilitation and a productive life in prison (little weight); (8) childhood and background of poverty, domestic abuse, and parental abandonment (moderate weight); (9) prior involvement in the Haitian Baptist Church; worked diligently to become a United States citizen; showed improved understanding of parenting techniques and successfully completed a parenting class at the David Lawrence Center; previously noted by DCF to be a good and interactive father; positive role model to other inmates; easily managed in prison; and loves parents, who love him (collectively given some weight); (10) mutually combative relationship with Guerline (not

mitigating); (11) impact of execution on Damas's parents (some weight); and (12) DCF and the David Lawrence Center failed Damas by not recognizing mental health issues and providing services to him (little weight, and citing previous findings with respect to Damas's "alleged mental illnesses").

This appeal follows.

## ANALYSIS

### *Self-Representation*

Damas first asserts that the trial court erred when it declined his request for self-representation. A criminal defendant has the right to self-representation, *Faretta*, 422 U.S. at 819, and a trial court "shall not deny a defendant's unequivocal request to represent himself or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel." *Weaver v. State*, 894 So. 2d 178, 192 (Fla. 2004) (quoting Fla. R. Crim. P. 3.111(d)(3)). "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself." *Godinez v. Moran*, 509 U.S. 389, 399 (1993). The standard of review with respect to a ruling on a request for self-representation is abuse of discretion. *Holland v. State*, 773 So. 2d 1065, 1069 (Fla. 2000).

Having reviewed the *Faretta* inquiry that was conducted, we conclude the trial court did not abuse its discretion in denying Damas's request for self-representation. During the inquiry, Damas was uncooperative, refusing to acknowledge that he even had a lawyer, let alone confirm to the court that he understood the ways in which counsel could assist him. Damas interrupted and argued with the court. Instead of answering questions with "yes" or "no" responses, Damas insisted he just wanted to plead guilty. As a result, Damas thwarted the trial court's efforts to conduct the *Faretta* inquiry to determine whether he could knowingly and intelligently waive his right to counsel. Accordingly, this claim is without merit.[15]

*Doubling of Aggravators*

Damas next asserts that the trial court's finding of both the under the age of twelve and the familial/custodial authority aggravating factors constitutes improper

---

15. That being said, we note that it was not appropriate for the trial court to reference Damas's "fail[ure] to demonstrate sufficient understanding of the legal process" as a basis for denying Damas's request to represent himself. *See State v. Bowen*, 698 So. 2d 248, 251 (Fla. 1997) ("[O]nce a court determines that a competent defendant of his or her own free will has 'knowingly and intelligently' waived the right to counsel, the dictates of *Faretta* are satisfied, the inquiry is over, and the defendant may proceed unrepresented. The court may not inquire further into whether the defendant 'could provide himself with a substantively qualitative defense,' for it is within the defendant's rights, if he or she so chooses, to sit mute and mount no defense at all." (citations omitted) (footnote omitted) (quoting *Bowen v. State*, 677 So. 2d 863, 864 (Fla. 2d DCA 1996)).

doubling. This claim was not raised by Damas below and, therefore, it is unpreserved and procedurally barred on appeal. *Perez v. State*, 919 So. 2d 347, 359 (Fla. 2005) (noting that for an issue to be preserved for appeal, the specific legal argument must be presented to the lower court).

However, even on the merits, we conclude Damas's claim is without merit. This Court has explained:

> Improper doubling occurs when both aggravators rely on the same essential feature or aspect of the crime. *Provence v. State*, 337 So. 2d 783, 786 (Fla. 1976). However, there is no reason why the facts in a given case may not support multiple aggravating factors so long as they are separate and distinct aggravators and not merely restatements of each other, as in murder committed during a burglary or robbery and murder for pecuniary gain, or murder committed to avoid arrest and murder committed to hinder law enforcement.

*Banks v. State*, 700 So. 2d 363, 367 (Fla. 1997). For example, in *Smith v. State*, 28 So. 3d 838 (Fla. 2009), we held improper doubling did not occur when the trial court found as aggravating factors both that the victim was under the age of twelve and that the murder was committed during the course of a sexual battery upon a child under the age of twelve:

> [T]hese two aggravators are separate and distinct because one is based exclusively upon the age of the victim and the other is based upon the commission of a totally separate, different, and additional felony at the time of the murder (i.e., sexual battery), regardless of whether it is a child who is the victim of that contemporaneous felony. Indeed, to conclude that the "in the course of a sexual battery" aggravator cannot also be found and applied with the "under the age of twelve" aggravator would produce illogical results. The "committed in the course of a felony" aggravator lists numerous felonies to which it

- 26 -

applies, including robbery, burglary, or arson. Under Smith's interpretation, if a child dies while the defendant commits arson or a robbery, *two* aggravators may be found and applied by the trial court, simply because the contemporaneous felony does not provide a specific reference to the age of a child. Conversely, a defendant who sexually batters and murders a child will only be subject to one statutory aggravator. Neither a jury nor a sentencing court should be precluded from considering as an aggravating circumstance that the murder occurred during the commission of a second violent felony simply because the defendant murdered a child and the additional felony includes an age component. Section 921.141(5)(d), Florida Statutes (2004), lists sexual battery—*not* sexual battery upon a child under the age of twelve—as a qualifying crime for application of this aggravating circumstance, and these two aggravators are not "merely restatements of each other" and do not rely upon the "same essential feature or aspect of the crime." *Banks*, 700 So. 2d at 367.

*Id.* at 864.

The under the age of twelve aggravating factor focuses, by its own terms, on the *age* of the victim. Conversely, the familial/custodial authority aggravating factor focuses upon the *relationship between* the victim and the defendant. Just as a child under the age of twelve can be murdered by a complete stranger, someone who is over the age of twelve can be murdered by an individual who stands in a position of familial or custodial authority over the victim. Accordingly, these aggravators are not simply restatements of each other.

This interpretation is consistent with our precedent. For example, in *Covington v. State*, 228 So. 3d 49, 52, 60 (Fla. 2017), we affirmed three death sentences where two children and their mother were murdered, and the trial court separately found and weighed both the under the age of twelve and the familial/

- 27 -

custodial authority aggravators with respect to the children. In that case, the defendant moved in with his girlfriend—the mother of the children—and "stepped into the role of having familial or custodial authority over the children by virtue of the fact that he cared for the children while their mother worked, cooked for them, cleaned them, disciplined them, encouraged them to eat right, taught [the boy] about dangerous people in the world, helped potty-train [the girl], and had a 'parent-like' relationship with them." *Id.* at 62. In concluding that competent substantial evidence supported the finding of the familial/custodial authority aggravator, we explained the defendant's "role as a live-in parental figure to [the children] heightened their vulnerability to his violent character" and further noted:

> [The defendant's] role as an authority figure over the children explains why [the girl] allowed [the defendant] to approach her on the morning of her murder even though she knew he was angry with her. And [the defendant] was able to approach [the sleeping boy] in his bed and stab him by virtue of his role as a parental figure in the home.

*Id.* at 62-63. These statements demonstrate this aggravator focuses upon the unique elements of trust and abuse of that trust when the defendant has some sort of power over the victim by virtue of being a relative of, or someone who has assumed a custodial role with respect to, the victim. Such a relationship is not tied to whether the victim is under the age of twelve. *See also Wall v. State*, 238 So. 3d 127, 139 (Fla. 2018) (trial court separately found under the age of twelve and familial/custodial authority aggravating factors, but merged the under the age of

twelve aggravator with the aggravating factor that the murder occurred during the course of aggravated child abuse).

Based upon the foregoing, the finding and weighing of both the under the age of twelve and the familial/custodial authority aggravating factors by the trial court did not constitute improper doubling. Accordingly, we reject this claim.

*Constitutionality of the Death Penalty*

In his final challenge, Damas contends that the death penalty violates the Eighth Amendment to the United States Constitution because it is inherently cruel and unusual. As with the prior issue, this challenge is procedurally barred because it was not raised before the trial court. Further, in 1976, a majority of the United States Supreme Court concluded the death penalty does not facially violate the Eighth Amendment. *Gregg v. Georgia*, 428 U.S. 153, 169 (1976) ("We now hold that the punishment of death does not invariably violate the Constitution." (joint opinion of Stewart, Powell, and Stevens, JJ.)); *see also id.* at 226 ("[N]either can I agree with the petitioner's other basic argument that the death penalty, however imposed and for whatever crime, is cruel and unusual punishment." (White, J., concurring in the judgment, and joined by Burger, C.J., and Rehnquist, J.)). The Supreme Court relied on the joint opinion in *Gregg* for the proposition that:

> Considerations of federalism, as well as respect for the ability of a
> legislature to evaluate, in terms of its particular State, the moral
> consensus concerning the death penalty and its social utility as a
> sanction, require us to conclude, in the absence of more convincing

evidence, that the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe.

*McCleskey v. Kemp*, 481 U.S. 279, 302 (1987) (quoting *Gregg*, 428 U.S. at 186-87).  Thus, absent a statutory change in Florida law, which authorizes capital punishment, *see* § 775.082(1)(a), Fla. Stat. (2018), or a holding to the contrary by the United States Supreme Court, Damas's broad challenge to the constitutionality of the death penalty fails.

*Guilty Pleas*

Although Damas has not challenged his guilty pleas, where a capital defendant enters a plea to a charge of first-degree murder, and a sentence of death is imposed,

> This Court reviews "the record of a death penalty case to determine whether the evidence is sufficient to support the murder conviction." *Winkles v. State*, 894 So. 2d 842, 847 (Fla. 2005); *see also Davis v. State*, 859 So. 2d 465, 480 (Fla. 2003).  However, where the death penalty is imposed after a defendant has [pleaded] guilty to a first-degree murder charge, "this Court's [mandatory] review shifts to the knowing, intelligent, and voluntary nature of that plea." *Barnes v. State*, 29 So. 3d 1010, 1020 (Fla. 2010), *cert. denied,* —U.S.—, 131 S. Ct. 234, 178 L. Ed. 2d 155 (2010) (quoting *Tanzi v. State*, 964 So. 2d 106, 121 (Fla. 2007)).  This Court "scrutinize[s] the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and [pleaded] guilty voluntarily." *Winkles*, 894 So. 2d at 847 (quoting *Ocha v. State*, 826 So. 2d 956, 965 (Fla. 2002)).

*Altersberger v. State*, 103 So. 3d 122, 128 (Fla. 2012) (second and third alterations in original); *see also* Fla. R. App. P. 9.142(a)(5) (noting that the Court shall review

the sufficiency of the evidence underlying the conviction, regardless of whether it is raised on appeal).[16]

Here, the trial court required Damas to execute an affidavit in support of the guilty pleas (and a waiver of a penalty-phase jury). The trial court further conducted an extensive colloquy, asking Damas questions such as (1) whether he knew his date of birth and age; (2) whether he could read, write, and understand the English language; (3) whether he had ever been treated for a disability that would interfere with his ability to read, write, or understand the trial court; (4) whether he agreed with mental health evaluations that concluded he does not suffer from any mental illness which would impair his capacity to participate in the proceedings; (5) whether he agreed that his decision to plead guilty, waive jury proceedings, waive penalty-phase mitigation, and accept death sentences was freely, intelligently, and voluntarily made, and was not the product of an underlying mental disorder; and (6) whether he was currently prescribed medication for an underlying mental illness, or was under the influence of anything that would interfere with his ability to participate in the proceedings.

The trial court then asked Damas how he wished to plead to each of the six counts of murder and he responded "guilty." Damas confirmed he understood that

---

16. We have reviewed the record and conclude that sufficient evidence exists to support the six convictions of first-degree premeditated murder.

- 31 -

by entering a guilty plea, he was giving up the right to a jury trial; the right to hear the testimony of State witnesses and the right to cross-examine those witnesses; the right to subpoena and present his own witnesses; the right to remain silent; and the presumption of innocence. Damas verified that he understood the maximum sentence for each count was death, while the minimum sentence was life imprisonment without the possibility of parole. Damas confirmed that he had read the plea form, discussed it with his counsel, and agreed with the terms and conditions of the pleas. He confirmed he understood that by pleading guilty, he was waiving his right to assert any possible defenses, and he was abandoning any pending or potential motions that could be filed by the defense on his behalf. Damas stated he was not threatened, coerced, or promised anything in exchange for the guilty pleas and that, after careful consideration, he wished to plead guilty because he believed it was in his best interest. Damas averred that he was pleading guilty because he is guilty.

Based upon the foregoing, we conclude that Damas "was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and [pleaded] guilty voluntarily." *Altersberger*, 103 So. 3d at 128 (quoting *Winkles*, 894 So. 2d at 847). We hold the extensive colloquy conducted by the trial court and Damas's responses to the questions asked demonstrate that his guilty pleas were knowing, intelligent, and voluntary. *Id.*

*Proportionality*

As with the guilty pleas, although Damas does not challenge the proportionality of his six death sentences, we nonetheless review those sentences to confirm they are proportionate to other cases in which a sentence of death was imposed. We have explained:

> "In reviewing a death sentence for proportionality, we ensure that the death penalty is 'reserved only for those cases where the most aggravating and least mitigating circumstances exist.' " *McGirth v. State*, 48 So. 3d 777, 796 (Fla. 2010) (quoting *Terry v. State*, 668 So. 2d 954, 965 (Fla. 1996)), *cert. denied*, —U.S.—, 131 S. Ct. 2100, 179 L. Ed. 2d 898 (2010). This Court's "review on proportionality is not a comparison between the number of aggravators and mitigators." *McGirth*, 48 So. 3d at 796; *see Barnes v. State*, 29 So. 3d 1010, 1028 (Fla.), *cert. denied*, —U.S.—, 131 S. Ct. 234, 178 L. Ed. 2d 155 (2010). Proportionality review requires this Court to engage in a qualitative review of the "totality of the circumstances and compare the present case with other capital cases in which this Court has found that death was a proportionate punishment." *Wright v. State*, 19 So. 3d 277, 303 (Fla. 2009) (citing *Urbin v. State*, 714 So. 2d 411, 416 (Fla. 1998)).

*Russ v. State*, 73 So. 3d 178, 198-99 (Fla. 2011). Here, the trial court found a total of five aggravating factors with respect to the six victims: three with respect to Guerline (HAC, CCP, and prior violent felony); five with respect to Meshach and Marven (HAC, CCP, prior violent felony, under the age of twelve, and familial/custodial authority); and four with respect to Maven, Megan, and Morgan (CCP, prior violent felony, under the age of twelve, and familial/custodial authority). Each aggravating circumstance was given great weight. In contrast to

- 33 -

these findings, of the mitigation found by the trial court to be established by the greater weight of the evidence, only one group—relating to Damas's "childhood and background of poverty, domestic abuse, and abandonment by his parents"—received moderate weight. The other factors were given only some or little weight. Moreover, qualitatively, HAC, CCP, and prior violent felony are three of the weightiest aggravating circumstances. *Zommer v. State*, 31 So. 3d 733, 751 (Fla. 2010).

A review of this Court's precedent reflects that Damas's death sentences are proportionate to other capital cases where the defendant murdered multiple individuals, including the defendant's own children or children with whom the defendant had a custodial relationship. In *Wall*, 238 So. 3d at 130, we affirmed two sentences of death where the defendant murdered his fiancée and their five-week-old son. The trial court found four aggravators with respect to each victim, including HAC and CCP for the fiancée, and under the age of twelve and familial/custodial authority with respect to the child. *Id.* at 139.[17] The trial court found with respect to the murder of the fiancée the mitigating circumstance that the defendant was under an extreme mental or emotional disturbance and afforded it

_____

17. As previously noted, the under the age of twelve aggravator was merged with the aggravating factor that the murder occurred while the defendant was engaged in the commission of aggravated child abuse. 238 So. 3d at 139.

moderate weight. *Id.* In mitigation as to both murders, the trial court found factors such as the defendant (1) was abused by his mother and attempted to shield his siblings from her abuse (slight weight); (2) suffered from mental illness and received inconsistent mental health treatment from early childhood (some weight); (3) suffered from significant childhood trauma and abuse (some weight); (4) experienced prolonged institutionalization from a young age (slight weight); and (5) had a family pattern of mental illness (very slight weight). *Id.* at 139-40.

In *Covington*, 228 So. 3d at 52, we affirmed three sentences of death where the defendant killed his girlfriend and her two children. With respect to the girlfriend, the trial court found in aggravation HAC, prior violent felony, and that the murder was committed while the defendant was on probation. *Id.* at 60. With respect to one child, the court found prior violent felony, under the age of twelve, familial/custodial authority, and the murder was committed while the defendant was on probation. *Id.* With respect to the second child, the court found the same aggravating factors as the first child, but also found HAC. *Id.* In mitigation, the trial court found the statutory mitigating circumstances of extreme emotional disturbance and no significant prior criminal history, and afforded both moderate weight. *Id.* Moreover, the trial court found multiple nonstatutory mitigating circumstances, affording one great weight—the defendant suffered from bipolar disorder, intermittent explosive disorder, and cocaine and alcohol abuse disorder—

- 35 -

and several others moderate weight, such as that his capacity to conform his conduct to the requirements of the law was diminished due to his mental illness and his voluntary use of cocaine and alcohol; he did not resist law enforcement and cooperated with the detectives during the investigation of the murders; and he pleaded guilty and acknowledged responsibility, thereby sparing the family of the victims the trauma of a trial. *Id.* at 60-61.

In *Zakrzewski v. State*, 717 So. 2d 488, 490-91 (Fla. 1998), the Court affirmed three death sentences where the defendant killed his wife and two children. The trial court found prior violent felony, HAC, and CCP as to all three murders. *Id.* at 491. The trial court gave significant weight to the statutory mitigators that the defendant was under an extreme emotional disturbance at the time of the murders and had no significant prior criminal history. *Id.* Moreover, in addition to other mitigating circumstances that were given lesser weight, the trial court gave substantial weight to the mitigating circumstances that the defendant showed severe grief and remorse, and he was a loving father until the offenses. *Id.* at 491 nn.1-2. The court also gave significant weight to the mitigating circumstances that the defendant was an exceptionally hard worker, was on the dean's list during his third year of college, and served in an exemplary manner in the United States Air Force. *Id.* nn.1-2.

The present case surpasses the aforementioned cases in total number of murders and in number of child victims. Moreover, no mitigating factor in this case found to be established was given great weight, substantial weight, or significant weight. The trial court only gave one factor moderate weight. Each of the murders in this case is among the most aggravated and least mitigated. For example, we note the prolonged physical and emotional torment experienced by Guerline, who begged for Damas not to hurt the children as he bound her extensively with duct tape. We also note how Damas carefully considered the implications of allowing Meshach, Maven, Marven, Megan, and Morgan to live before he decided to systematically murder them. Based upon the totality of the circumstances, we hold that each of the death sentences is proportionate.

## CONCLUSION

In light of the foregoing, we affirm Damas's convictions and his six sentences of death.

It is so ordered.

CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and LAWSON, JJ., concur.

NO MOTION FOR REHEARING WILL BE ALLOWED.

An Appeal from the Circuit Court in and for Collier County,
        Christine Greider, Judge - Case No. 112009CF002298AXXXXX

Valarie Linnen, Atlantic Beach, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Lisa Martin, Assistant Attorney General, Tampa, Florida,

for Appellee